1    K8LLUNID

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------x

4    UNIFORMED FIRE OFFICERS
     ASSOCIATION *et al*,
5
                    Plaintiffs,
6
              v.                              20 Civ. 05441-KPF
7

8    BILL DE BLASIO *et al*,
                                              **Decision**
9
                    Defendants.
10
     ------------------------------x
11                                            New York, N.Y.
                                              August 21, 2020
12                                            12:00 p.m.

13   Before:

14                    HON. KATHERINE POLK FAILLA,

15                                            District Judge

16
                              APPEARANCES
17
     DLA PIPER US LLP (NY)
18        Attorney for Plaintiff Uniformed Fire Officers Association
     BY:  ANTHONY PAUL COLES
19        COURTNEY GILLIGAN SALESKI

20   NEW YORK CITY LAW DEPARTMENT
          Attorney for Defendants Bill de Blasio, *et al*
21   BY:  DOMINIQUE F. SAINT-FORT
          REBECCA GIBSON QUINN
22        KAMI ZUMBACH BARKER

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1          DEPUTY CLERK:  First, this is a public courtroom, even

2     if it's remote.  And members of the media and/or public have

3     been known to dial in and listen to proceedings N this

4     instance, we have 126 participants listening in to that point,

5     I'm going to ask that all listening -- listen-only participants

6     place their phones on mute at this time.

7          We do have a court reporter on the line.  I'm going to

8     ask that if you do need to speak during this conference, that

9     you will give your name before you do speak so that way it's

10    clear to the court reporter on who is speaking and the

11    transcript is accurate.

12         The recording and/or rebroadcasting of this conference

13    is not permitted by any participant.  That includes listen-only

14    participants.  We will be recording it on our end as a backup

15    to the court reporter T court reporter's transcript is the

16    official transcript for this conference.

17         I'm just going to remind everybody once again because

18    it's very important with the number of people who we have on

19    the line that you put your phones on mute so that way there is

20    no background noise or feedback interrupting the conference.

21         With that, do I have any questions regarding the

22    instructions that I have given?

23         Hearing nothing, I will be bringing in the Judge.

24    Please hold.

25         (Case called)

```
1              DEPUTY CLERK:  Counsel for the parties please state
2    your names for the record, beginning with plaintiffs.
3              Good afternoon, your Honor.
4              MR. COLES:  Tony Coles, for the plaintiffs.  And I'm
5    here with Courtney Saleski.
6              THE COURT:  Good afternoon.  And thank you very much.
7              And representing the defendants?
8              MS. SAINT-FORT:  Dominique Saint-Fort, representing
9    defendants, along with Rebecca Quinn and Kami Barker.
10             THE COURT:  Thank you very much.  Good afternoon to
11   each of you.
12             I know there are many amici and other interests
13   parties who are on this call.  I'm aware that there are over a
14   hundred lines on this call.  So I won't go through the trouble
15   of reading off everyone's appearance.  But I did hear my deputy
16   take those appearances this afternoon, so I know that you're
17   all there.  And I thank you for appearing.  I suspect the
18   beeping that we're now hearing are people joining or exiting
19   the conversation is going to plague us throughout the
20   conversation, but we will deal with it.
21             Let me please ask the court reporter if she has any
22   difficulty in hearing me.
23             Okay.  Thank you.
24             I am going to ask everyone else please to mute their
25   phones.  I'm going to give the decision now on plaintiffs'
```

1   motion for preliminary injunction.  And what I can say to you

2   is that it is quite a long decision and so I will do my best to

3   read it carefully.  But it will go much easier if I'm not

4   hearing background noises.  So since I'm not speaking to any of

5   you specifically at this time, please, please set your phones

6   to mute.  Thank you very much.  I will now begin.

7          On June 12th of 2020, Governor Cuomo signed

8   legislation that, in relevant part, repealed New York Civil

9   Rights Law, Section 50-a.  That provision, summarily speaking,

10  protected from disclosure under New York's Freedom of

11  Information Law -- or "FOIL" -- certain records regarding

12  police, sheriffs, firefighters, correction officers and peace

13  officers.  And as made clear from the submissions of the

14  parties (and even more so, the amici) the repeal was the

15  product of extensive debates, including debates over the

16  continued protection of a narrower class of information derived

17  from these same records.  Concurrently, with the repeal, the

18  New York legislature passed amendments to the New York Public

19  Officers Law that added Section 89(2-b) and 89(2-c), the former

20  of which mandated redaction of certain types of personal

21  identifying information and the latter of which allowed (but

22  did not require) law enforcement agencies to "redact records

23  pertaining to technical infractions."

24         On July 14th, 2020, plaintiffs brought this action in

25  New York State Supreme Court, seeking "to temporarily and

1    permanently enjoin defendants from releasing unsubstantiated

2    and non-final disciplinary records of firefighters, police, and

3    correction officers" under a variety of theories.  On July 15,

4    2020, defendants removed the matter to this Court, by which

5    time the state court judge had ordered either injunctive relief

6    or a stay until the Court could consider the matter.  On

7    July 22nd of 2020, the Court entered a temporary restraining

8    order, finding in relevant part that there were serious issues

9    that transcend reputation, that affect employment, that affect

10   safety, which were accepted as speculative and imminent for

11   purposes of today's proceeding.

12           Excuse me.  I'm sorry.  I'm going to pause for a

13   moment.  I'm hearing someone in the background.  I'm just going

14   to ask again if folks could please mute their phones.

15           Returning to the decision.  I did also find that the

16   plaintiffs had raised sufficiently serious questions going to

17   the merits, particularly on their contractual claims that a TRO

18   was warranted.  I ordered expedited discovery.  I scheduled a

19   hearing on the application for a preliminary injunction to be

20   held on August 18th of 2020.  And on July 28th of 2020, after

21   receiving briefing from the parties and from the New York Civil

22   Liberties Union, I modified the TRO order so that it no longer

23   applied to NYCLU.  Plaintiffs appealed that modification to the

24   Second Circuit, and yesterday the Second Circuit denied

25   plaintiffs' motion for a stay pending appeal.  And it is my

1    understanding that NYCLU have posted those records in

2    searchable form on its website.

3            Between July 22 of 2020, and August 14th of 2020, I

4    received substantial briefing and supporting materials from the

5    parties, as well as the many submissions of the amici.  I heard

6    several hours of oral argument on August 18th of 2020.  And I

7    want to reiterate my thanks and my appreciation to all of you

8    who prepared materials to aid me in resolving these significant

9    issues.

10           From oral argument, I understand plaintiffs to be

11   asking me to enjoin defendants from producing reports and

12   records of allegations that were determined to be

13   unsubstantiated, unfounded, truncated, or exonerated; those

14   matters that are non-final; and those allegations that were

15   addressed by settlement agreements between law enforcement

16   officers and agencies entered into before the repeal of Section

17   50-a.  During the TRO hearing, I also directed defense counsel

18   to provide what I call the "final answer from each of the

19   organizational defendants concerning precisely what materials

20   were contemplated to be disclosed."

21           I learned that CCRB planned "to establish an online

22   database that would allow members of the public to search for

23   CCRB officer histories," including "cases that were

24   substantiated, unsubstantiated, unfounded, and truncated."  Of

25   the NYPD plan to publicly release on its website charges and

1    specifications regardless of whether they had been adjudicated,

2    and responses to FOIL requests for the disciplinary records of

3    members of service received following the repeal of Section

4    50-a where the requested disciplinary records resulted in a

5    substantiated final determination.  I also understood that the

6    FDNY had not yet developed a protocol or a process for the

7    public release of firefighter or fire officer disciplinary

8    records.  and the Department of Corrections has not yet made a

9    plan, but has assured plaintiffs it would not release

10   unsubstantiated and non-final allegations.  In light of those

11   responses, I understood the focus of plaintiffs' PI motion to

12   be on the NYPD and CCRB materials that I've mentioned earlier,

13   particularly the unsubstantiated, unfounded, truncated,

14   exonerated, non-final, and those addressed by settlement

15   agreements, and I have focused my analysis accordingly.  For

16   the reasons set forth in the remainder of this oral opinion,

17   with a very limited exception for certain NYPD materials that I

18   believe to be squarely covered by certain collective bargaining

19   agreements, I am denying plaintiffs' motion.

20        We'll begin with the relevant legal standard.  And "in

21   general, a district court may grant a preliminary injunction if

22   the moving party establishes that it is likely to suffer

23   irreparable injury if the injunction is not granted, and either

24   a likelihood of success on the merits of its claim, or the

25   existence of serious questions going to the merits of its claim

1   and a balance of hardships tipping decidedly in its favor."

2   I'm quoting there from *Plaza Health Laboratories v. Perales*, a

3   Second Circuit decision from 1989, reported at 878 F.2d, 577.

4           Lest you think otherwise, I do recognize that there

5   are other factors in the mix.  In the most recent decision from

6   the Second Circuit, *New York v. the United States Department of*

7   *Homeland Security,* a decision that has not yet been given, an

8   F.3d cite that is contained at West Law 2020 WL4457951.  Judge

9   Lynch, writing for the Court and citing to the *Winter* decision,

10  also noted the factors of the balance of equities tipping in

11  favor of the movant and that the injunction be in the public

12  interest.  He noted as well for the panel that where the

13  government was a party to the suit, the final two factors

14  merged.

15          During the TRO proceedings, I recognized both

16  formulations of the standard set forth in *Plaza Health Labs*,

17  and I focused in particular on the serious question standard,

18  because that was the basis for my TRO release.  The Amicus CPR

19  reminded me, however, that the Second Circuit has held that

20  where the moving party seeks to stay governmental action taken

21  in the public interest pursuant to a statutory or regulatory

22  scheme, the district court should not apply the less rigorous

23  fair ground for litigation standard and should not grant the

24  injunction unless the moving party establishes, along with

25  irreparable injury, a likelihood that he will succeed on the

1    merits of his claim.

2          I'm citing there to *Plaza Health Labs*, but also to the

3    decision this year by the Second Circuit in *Trump v. Deutsche*

4    *Bank AG*, which was reversed on other grounds by the Supreme

5    Court in the case *Trump v. Mazars, USA.*  The Second Circuit has

6    explained that this exception reflects the idea that

7    governmental policies implemented through regulations developed

8    through presumptively reasoned democratic processes are

9    entitled to a higher degree of deference and should not be

10   enjoined lightly.  And in so doing, they were citing to their

11   prior decision in *Able v. United States* in 1995.

12         Now, during the PI hearing, plaintiffs' counsel

13   disagreed with CPR's analysis and argued directing my attention

14   to *Otoe-Missouria Tribe of Indians v. New York State Dep't of*

15   *Fin. Servs*, 769 F.3d 105 from 2014, that where the Government

16   engages in policy-making and does not take action pursuant to a

17   statutory scheme, the serious-questions standard applies.

18         I'll note in my review of that case, after the

19   argument, the challenged conduct was actually subjected to

20   review under a likelihood of success standard, which is the

21   standard that I'm finding applicable here today.  And it may

22   well be the case that plaintiffs' counsel was, in fact,

23   directing my attention to a case cited within *Otoe-Missouria*,

24   that is*, Haitian Centers Council v. McNary*.  And in that case

25   the Second Circuit used the "fair ground for litigation"

1    standard in upholding an order enjoining INS from limiting

2    Haitian asylum applicants' contact with counsel while detained

3    at Guantanamo Bay.  But that case was distinguished in its own

4    text and in *Otoe-Missouria,* the latter of which noted that

5    there the government was seeking to enforce an informal policy

6    "hastily adopted without the benefit of either specific

7    statutory instructions or regulations issued after a public

8    notice-and-comment process."  I'm quoting there from 769 F.3d

9    at 111.  That reasoning is simply inapplicable here.

10        Plaintiffs' counsel has emphasized to me that

11   plaintiffs are not litigating the repeal of Civil Rights Law

12   Section 50-a, and so I have focused on whether defendants'

13   post-repeal approaches to responding to FOIL requests qualify

14   as "government action taken in the public interest pursuant to

15   a statutory or regulatory scheme so as to preclude application

16   of the less rigorous serious-questions standard."  And I do

17   find that these actions so qualify, and thus that the higher

18   likelihood of success standard applies.  With one exception

19   relating to this limited category of NYPD materials I'll talk

20   about later, plaintiffs have not met their burden.  But even

21   were I to use the serious-questions standard, the result would

22   be the same.  And plaintiffs fail to show that the balance of

23   hardships tips decidedly in their favor.

24        Turning now to the issue of irreparable harm.  It is

25   defined by the Second Circuit as "injury that is neither remote

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    nor speculative, but actual and imminent that cannot be

2    remedied by an award of monetary damages."  I'm quoting here

3    from the 2015 Second Circuit decision in *New York ex rel*

4    *Schneiderman v. Actavis PLC*.  This is the issue on which my

5    prior TRO hearing and ruling was predicated, and it's the issue

6    on which, with a more complete record, I am finding to the

7    contrary.

8          And I want to make a preliminary observation about

9    irreparable harm.  And it relates to the many disclosures that

10   were made by CCRB in the time period between June 12, 2020, the

11   repeal, and July 14, 2020, the filing of this lawsuit.

12   Plaintiffs' counsel argued to me at the PI hearing that these

13   disclosures were immaterial to my analysis, except insofar as

14   they were further indications of violations of their rights.

15   And yet, I fail to see the logic of having me enjoin defendants

16   from disclosing prospectively materials that have already been

17   produced and that are already being published and analyzed by

18   third parties.  This would include the CCRB records that NYCLU

19   has just published.  To my mind, any injunctive relief that I

20   would order could not put that particular horse back in the

21   bank.  But putting the issue aside, I find the plaintiffs have

22   failed to satisfy their burden of showing irreparable harm.

23   Broadly speaking, plaintiffs posit two categories of harm:

24   Reputational harm and loss of privacy; and risk of harm to the

25   officers and their families.

1          Turning first to the issue of reputation harm:  The

2     plaintiffs proffer the expert report of Dr. Jon Shane, who

3     opines in a rather brief expert report that, based on his

4     experience, training and education "to a reasonable degree of

5     professional certainty, publication of unsubstantiated and

6     non-final allegations will have a disproportionate and unfairly

7     damaging and stigmatizing effect on a police officer's future

8     employment prospects.  Publication of these allegations will

9     decrease future job prospects and may cause an officer to be

10    deprived of a position he or she applies for.  This damaging

11    effect is likely even when allegations are characterized as

12    unsubstantiated or unfounded, and even when they result in

13    exonerated or not-guilty determination."

14         The defendants have moved to strike Dr. Shane's report

15    based on the timing of the disclosure and his qualifications.

16    I am denying that motion and I am accepting the report.  But

17    given it the weight to which it is entitled, it does not

18    suffice to demonstrate irreparable harm.  Dr. Shane presents no

19    empirical evidence to support his findings and no anecdotal

20    evidence.  His opinion at base is rumination -- reasoning, for

21    example, that if an officer decides to move from one department

22    or law enforcement agency to another, the hiring department or

23    agency will likely give undue and unfair weight to the

24    unsubstantiated and non-final allegations, rendering them

25    stigma, regardless of the agency's intention behind the

1    release.  And yet he has not one law enforcement officer's

2    statement to substantiate his claim.  And it's not as though

3    there isn't a universe of information from which he can draw.

4    Quite to the contrary, the NAACP Amicus brief identifies 12

5    states -- Alabama, Arizona, Connecticut, Georgia, Florida,

6    Ohio, Maine, Minnesota, North Dakota, Utah, Washington, and

7    Wisconsin -- where police conduct records, including

8    unsubstantiated complaints and complaints where no disciplinary

9    action resulted from the investigation, are generally available

10   to the public.  On this point, I actually found the declaration

11   of Brendan Cox, who was engaged in the hiring process as chief

12   of the Albany Police Department, to be far more compelling.

13           Moreover, as defendants note, plaintiffs do not offer

14   any specific evidence that evidence plaintiffs do not offer any

15   specific evidence that anyone is imminently facing something

16   like this.  For example, evidence about officer seeking

17   employment, prospective employers, information employers can

18   access already regarding misconduct and disciplinary histories,

19   how they interpret that information, and how public access to

20   data would therefore change any employment calculus.  And I am

21   concerned -- and I think I disagree with one of Dr. Shane's

22   underlying premises, which is that it is somehow appropriate to

23   withhold information of this type from prospective law

24   enforcement employers because they are unable to appreciate the

25   dispositional designations used by agencies such as the CCRB.

1    Here too, I am persuaded by Mr. Cox's statements at paragraph

2    21 of his declaration regarding the importance of a prospective

3    law enforcement employer having all of this information

4    available and perhaps more importantly for this motion, having

5    the ability to contextualize that information properly.  On the

6    record before me I reject the argument that law enforcement

7    officers cannot interpret law enforcement reports from other

8    jurisdictions

9         Plaintiffs' counsel has also repeatedly focused on the

10   fact that approximately 92 percent of CCRB complaints are

11   resolved using a designation other than substantiated.  But

12   that suggests that such a disclosure is more likely to redound

13   to a reputational harm benefit.  It appears that plaintiffs are

14   eliding the distinction between the underlying allegation,

15   which may be about conduct that never happened, and the actual

16   record being released which record states the outcome of an

17   investigation into that complaint.  As well, any reputation

18   harm can be remedied by money damages.  And for those

19   propositions I'm citing *Guitard, v, United States Secretary of*

20   *the Navy*, 976 F.2d, 737, a Second Circuit decision from 1992;

21   citing the Supreme Court decision of *Sampson v. Murray,* 415

22   U.S. 61 from 1974; another Second Circuit decision, *Savage v.*

23   *Gorski,* 850 F.2d 64, a Second Circuit decision from 1998; and a

24   recent decision from a colleague of mine, Judge Oetken, in

25   *Nicholas v. Bratton,* not reported at 2016 WL 3093997, from June

1    of 2016.

2           Now, I did not understand plaintiffs to be claiming

3    privacy-based harms separate and apart from reputational harm,

4    and I also don't see a generalize privacy right inherent in the

5    disciplinary records of public employees, so I'm turning now to

6    the second proffered category of irreparable harm.  It is an

7    increased risk of harm to law enforcement officers and their

8    families.

9           (Pause)

10          THE COURT:  And the point I wished to make before I

11   paused was to underscore the fact that no one in this

12   litigation wants any harm to befall any officer or any

13   officer's family member.  No one wants an increased risk of

14   harm.  But the fact remains that plaintiffs have not met their

15   burden on this record of identifying an increased risk of harm

16   to officers or their families that can fairly be tied to the

17   disclosure or the potential for disclosure of these materials.

18          The NYPD officers cited by plaintiff who have lost

19   their lives because of their jobs, they are remembered, they

20   are respected.  And yet, I have no argument, and there can be

21   no argument, that their deaths were attributable to the repeal

22   of Section 50-a and the consequent changes in how defendant

23   agencies will respond to FOIL requests.  Plaintiffs have

24   presented speculation only that these changes in FOIL request

25   responses will increase the risk of officer harm.

1          I also note that before the state legislature,

2     plaintiffs could not provide a single example where the release

3     of misconduct or disciplinary reports have been linked to

4     officer safety concerns.  And the legislature at that time was

5     very keenly attuned to officer safety, which is why it later

6     amended the public officer's law to provide for mandatory

7     redactions of identifying information.

8          Plaintiffs have cited to me the increase in TAPU

9     investigations.  I don't dispute the fact of the increase, but

10    I do not believe that plaintiffs have or can link it to the

11    agency's new positions regarding FOIL request responses.  As

12    noted by the amici, there are numerous states with more robust

13    disclosure practices than New York's have been, with no

14    correlative uptick in violence or threats of violence to

15    officers and their families.  I'll mention again the NAACP

16    brief and the 12 states that they cite.  I don't see any safety

17    issues identified in those states.

18         The amici have also noted the disclosure practices of

19    the Chicago Police Department, which is a fair comparator to

20    the NYPD.  I've seen evidence regarding the Citizens Police

21    Data Project, which contains disciplinary records from Chicago

22    police officers in a comprehensive searchable format.  I

23    understand that the data includes more than 30,000 officers,

24    and almost 23,000 complaints between 2000 and 2018.  Again,

25    I've been presented with no evidence of increased violence or

1    threat of violence because of the disclosures.

2           Plaintiffs' argument also seems to overlook the

3    disclosures that have been historically been made.  And I'll

4    only note briefly the correction officer and fire officer

5    information available on oath, since their records aren't

6    really at the heart of this motion.  But for decades, until

7    2016, the NYPD posted officer disciplinary outcomes outside the

8    media room.  And for a short time, the CCRB disclosed summary

9    of officers' records in response to FOIL requests.

10           I'm also going to refrain from relying on the

11   ProPublica disclosure, as it is so recent, and the NYCLU

12   disclosure for the same reason.  But there was a prior

13   disclosure in 2018 when Buzzfeed News uploaded 1800 officer

14   disciplinary dispositions to a publicly available online

15   database.  And the Legal Aid Society has an online database

16   known as "CAPstat" which includes data from lawsuits against

17   NYPD officers over several years as well as the Buzzfeed data.

18   And I have not seen evidence of an incident in which member

19   officers were threatened or at risk of threat because of that

20   publication.

21           On the specific issue of "doxing," which came up at

22   this hearing, the legislature took this into account in

23   enacting the new FOIL provision requiring redactions -- not

24   allowing redactions -- for identifying information.  And while

25   there has been disclosures made over the years, pursuant to

1    leaks, plaintiffs have not pointed to an example of a police

2    officer getting doxed as a consequence.  They have not

3    explained how the specific information contained in CCRB

4    reports, for example, would make it easier for members of the

5    public to dox officers.  That's why I've not found irreparable

6    harm.

7            I'm going to turn now to the actual claims.  And for

8    analytical convenience, I've divided plaintiffs' claims into

9    contractual and constitutional.  And beginning with the former,

10   plaintiffs argue that their respective CBAs give them rights

11   that would be violated by the NYPD's and CCRB's contemplated

12   disclosures and databases.  I've reviewed the CBAs attach to

13   plaintiffs' petition at Docket entry No. 10.  In particular,

14   I've seen CBAs from the Sergeants' Benevolent Association, the

15   Police Benevolent Association, the Lieutenants' Benevolent

16   Association, and the Captain's Endowment Association.  And I

17   might be referring to those by abbreviations during this

18   portion of my opinion.

19           I'm aware, for example, that the SBA, the LBA, the

20   PBA, and the CEA filed grievances with deputy commissioner of

21   the police, Beirne, on July 15th of 2020, claiming that the

22   City had violated their respective CBA rights when it announced

23   the imminent publication of information regarding

24   unsubstantiated, unfounded, exonerated, and unadjudicated

25   departmental allegations against active and retired department

1    members.  I was made aware as well that the City and the NYPD

2    have filed a petition challenging the abitrability with the New

3    York City Board of Collective Bargaining.

4         All of the CBAs that I've been given contain a section

5    that is typically titled "Personal Folder."  It's typically

6    found in Section 7(c) of one of the Articles of the provision.

7    So for the SBA, it's Article 15 Section 7(c).  In the PBA's

8    CBA, it is Article 16 Section 17.  In the LBA's CBA, it is

9    Article 16 Section 7(c).  And in the CEA's CBA -- it's the one

10   outlier -- it's in Article 14 Section 6(c).  I'm going to call

11   it Section 7(c) nonetheless -- or maybe it's better for me to

12   call it the "personal folder section."  But what it provides is

13   that the department will, upon written request to the chief of

14   personnel by the individual employee, remove from the personal

15   folder investigative reports which, upon completion of the

16   investigation, are classified, exonerated, and/or unfounded.

17        Citing the personal folder section, plaintiffs have

18   argued that disclosing allegations of misconduct would

19   functionally negate the rights of officers to clear their

20   disciplinary records of unfounded and unsubstantiated

21   allegations where that information would forever be publicly

22   available in the future.  And in short, I completely disagree

23   with plaintiffs' broad interpretation of this provision, and in

24   no way do I believe that it can stretch so far as to prevent

25   the disclosure of this information.

1          The personal folder, as I've just read, the provision

2     gives the officer the right to request that an investigative

3     report be removed from a personnel file.  It does not give the

4     officer the right to have the investigative report removed from

5     the public record.  And so it remains the case that officers

6     can and will be able to exercise their rights under this

7     provision to have specified investigative reports removed from

8     their personnel or personal folder, and it remains the case

9     that the NYPD can remove such reports.  And by that measure,

10    whatever benefits the officers derived from having personal

11    files with this information removed remain available to them,

12    but it does not extend to exclude these materials from the

13    public.

14         And so, I have thought about whether this is something

15    that is more properly given to the arbitrator.  But there is

16    simply no way in which this provision is -- or which the

17    argument being made can be made under the CBAs.  And,

18    therefore, this is not a grievance to be arbitrated at all.

19    This is not a situation, as plaintiffs claimed at oral

20    argument, where the Court would be nullifying relief an

21    arbitrator might be able to provide because the relief sought

22    is simply nowhere to be found in the CBA.

23         I do want to talk, however, about another provision

24    which has given me more pause, and this is the one provision

25    where I am, in part, granting injunctive relief.  The CBAs

1    contain a provision that I will refer to as Section 8.  And it

2    appears in substantively identical form in different articles

3    of the CBAs.  But it typically provides as follows:

4         "Where an employee has been charged with a Schedule A

5    violation, and such case is heard in the trial room, and

6    disposition of the charge at trial or on review or appeal

7    therefrom is other than guilty, the employee concerned may,

8    after two years from such disposition, petition the police

9    commissioner for a review for the purpose of expunging the

10   record of the case.  Such review will be conducted by a board

11   composed of the deputy commissioner of trials, department

12   advocate, and chief of personnel or their designees.  The board

13   will make a recommendation to the police commissioner.  The

14   employee concern will be notified of the final decision by the

15   police commissioner -- by the deputy commissioner of trials.

16        The Court believes that the language of this

17   provision, which refers to expunging the record of the case, is

18   significantly broader than that of the personal folder section

19   that I just mentioned.  And although the CBAs are not entirely

20   clear when defining either the scope of expungement or the

21   "record of the case," expunging the record of the case is at

22   least more significant than removing a file from the personnel

23   folder.

24        I had also thought about defendants' argument to me

25   that Schedule A violations are basically the same as those that

1    the legislature accounted for in enacting Public Officer's Law

2    Section 89(2-c).  But the language of that provision, 89(2-c),

3    only states that a law enforcement agency may redact records

4    pertaining to technical infractions.  And so the Court is left

5    with the distinct possibility that certain records that

6    plaintiffs have the right to expunge under their CBAs may not

7    be redacted or withheld.  To be clear, it is not clear to me

8    what the Schedule A violation records are and whether this is

9    what's contemplated by the NYPD when they're talking about the

10   disclosure of charges and specifications.  And so I do believe

11   this is something that has to be resolved through the

12   arbitration process, or at least that I cannot resolve it on

13   this record.

14           I have considered arguments that have been made to me

15   that this would be contrary to public policy to permit the

16   CBAs -- to permit plaintiffs through the CBAs -- to block

17   public access to certain records.  But I have also thought

18   about the fact that Section 8 pertains only to Schedule A

19   violations, which I understand to be the more technical

20   violations.

21           And so while I do appreciate the arguments of the

22   defendants in the amici, that the public has an interest in all

23   disciplinary records of NYPD officers, in this particular

24   instance, I don't believe that I can say the that the public

25   interest is enough to surmount the union's contractual rights.

1    And so for this reason, this is the very limited injunction

2    that I am granting:

3         The NYPD and CCRB may not disclose records of Schedule

4    A command discipline violations for cases heard in the trial

5    room, for which the ultimate disposition of the charge at

6    trial, or on review or appeal, is other than guilty, which

7    records have been, are currently, or could be in the future the

8    subject of a request to expunge the record of the case pursuant

9    to Section 8, for those officers covered by the PBA, the SBA,

10   and the LBA, collective bargaining agreements.

11        I'm turning now to the argument of plaintiffs that the

12   NYPD's and CCRB's releases would be an anticipatory breach of

13   negotiated settlement agreements between police officers and

14   NYPD that were entered into before the repeal of Section 50-a.

15   And plaintiffs argue that by operation of law these agreements

16   include the confidentiality protection provided by Section

17   507-a.  Now, as an initial matter, plaintiffs provide no

18   compelling reason why the CCRB would be bound by the settlement

19   agreements between individual officers and the NYPD, to which

20   they're not a party.  And I, therefore, don't find that

21   plaintiffs' claim would succeed on the merits as to the CCRB's

22   disclosure.  It really boils down to the NYPD's anticipatory

23   breach of these agreements.

24        And in this regard, plaintiffs have cited *Skandia*

25   *America Reinsurance Corp. v. Schenck*, 441 F.Supp. 715, a

1    Southern District decision from 1977, for the proposition that
2    the law enforced at the time a contract is entered into becomes
3    a part of the contract.  I do believe the applicability of that
4    case is limited by its fact.  And in that case, as it happens,
5    the Court just interpreted an ambiguous provision in a contract
6    in light of then-applicable state law.

7          Instead, Mr. Coles pointed my attention to Williston
8    on Contracts, which states that, even when not expressly
9    stated, the parties to a contract are presumed to have
10   contracted with reference to existing principles of law.  But I
11   think that provision proves too much, because plaintiffs are
12   essentially arguing that a state legislature can never change
13   the law, that, while not even referenced in the parties'
14   agreement, might possibly impact a party's contractual rights.
15   I do not believe this to be the case, as the Supreme Court
16   recognized in the context of California law in the decision of
17   *DirectTV Incorporated v. Imburgia*, 136 Supreme Court 463 from
18   2015.

19         And even accepting plaintiffs' arguments that the
20   settlements were negotiated with reference to Section 50-a, the
21   Court must also accept that such settlements were negotiated
22   with reference to FOIL, which is, as the parties know, to be
23   liberally construed, and its exemptions narrowly tailored so
24   the public is granted maximum access to the records of
25   government.  I'm citing here to *Capital Newspapers, Div. of*

1    *Hearst Corp. v. Whalen,* 69 N.Y.2d 246 from 1987.

2           I also agree with defendants' argument that an agency

3    cannot bargain away the public's right to access public

4    records.  And there are cases for this point.  I bring to the

5    parties' attention, *LaRocca v. Bd. of Educ. of Jericho Union*

6    *Free School Dist.*, 632, N.Y.2d 576 (2d Dep't 1995); and

7    *Washington, D.C. Post Company vs. New York State Insurance*

8    *Department*, 61, N.Y.2d 557 from the Court of Appeals in 1984.

9           And in that latter case, *Washington Post*, the

10   insurance department asserted confidentiality as ground to

11   withhold documents from public inspection.  The Court of

12   Appeals there held that the insurance department's

13   long-standing promise of confidentiality was irrelevant to

14   whether the requested documents fit within the legislature's

15   definition of records under FOIL.  And it explained that

16   because of FOIL exemption for records confidentially disclosed

17   to an agency had been removed, the insurance companies had no

18   authority to use its label of confidentiality to prevent

19   disclosure.  And that's effectively the same argument that

20   plaintiffs are making here, that an agreement with an agency to

21   keep certain records confidential can be enough to prohibit

22   public access to such records.

23          But putting all of those legal issues to the side --

24   and they are considerable -- the plaintiffs have only provided

25   the Court with the most cursory explanations of these purported

1   settlement agreements.  I've not been provided with a single

2   example of a settlement agreement with the NYPD.  No witness,

3   no declarant has explained to me that she or he entered into a

4   settlement agreement with the NYPD in reliance on Section 50-a.

5   I am not going to speculate as to what rights the settlement

6   agreements provide to other parties.  And instead, I'm going to

7   turn to the constitutional claims.

8          Plaintiffs argue first that the release of these

9   records will violate officers' due process by, number one,

10  calling into question their good name, reputation, honor, or

11  integrity, and thereby stigmatizing them; number two, becoming

12  available to employers, credit agencies, landlords bank

13  officers, potentially eviscerating the futures of many of the

14  petitioners; and number three, violating what actually are

15  rather vague reliance interests that plaintiffs claim they had

16  in the City's guarantee of the confidentiality that such

17  records would remain confidential when the officers decided to

18  respond to allegations of misconduct.

19         I don't see this in their briefing as a basis that

20  plaintiffs continue to advance for the due process claim.

21  Instead, I believe the only right to confidentiality plaintiffs

22  can claim, prior to the repeal of 50-a, was 50-a itself.  And

23  so I do not find that there is an adequately alleged or

24  adequately demonstrated deprivation of some other liberty or

25  property right aside from the repeal of 50-a itself.  And so

1   plaintiffs' due process claim is really one of stigmatic or

2   reputational harm and the alleged consequences that flow from

3   that harm.  And a loss of reputation without more is

4   insufficient to establish a procedural due process claim.  I

5   cite to the Supreme Court's decision in *Paul vs. Davis*, 424

6   U.S. 693.  Instead, plaintiffs are required to establish a

7   stigma-plus claim.  And in such claims, courts recognize a

8   protected liberty interest in interest to one's reputation,

9   which is the stigma, coupled with the deprivation of some

10  tangible interest or property right, and that is the plus.  As

11  one of example of that, I cite to *DiBlasio v. Novello*, 344 F.3d

12  292, (2d Cir. 2003); and on the state court side, the matter of

13  *Lee TT. v. Dowling,* 87 N.Y.2d 699.  Plaintiffs argue that the

14  release of "unsubstantiated and non-final allegations" will not

15  only cause reputational or stigmatic harm, but will also

16  interfere officers' future employment opportunities.

17          And so I now turn to the elements of the stigma-plus

18  claim, and they include that the plaintiff must show the

19  utterance of a statement sufficiently derogatory to injure his

20  or her reputation, that is, capable of being proved false, and

21  that he or she claims is false, and also a material

22  state-imposed burden, or state-imposed alteration of the

23  plaintiffs' status or rights.  I'm citing here and quoting from

24  *Vega v. Lantz*, 596 F.3d 77, a Second Circuit decision from

25  2010.  And it, in turn, is quoting to a decision of Justice

1   Sotomayor, when she was a judge on the Second Circuit, *at*

2   *Sadallah v. City of Utica*, 383 F.3d, 34.

3        Now, as to the stigma prong, I find the plaintiffs

4   have failed to establish both that defendants' statements are

5   false and that the release of the records is a statement

6   sufficiently derogatory to injure plaintiffs' reputation.

7        First, I note that the records at issue are not false.

8   Plaintiffs claim that defendants' worldwide transmission of

9   unsubstantiated and non-final allegations, including those that

10  are misleading are simply false, will stigmatize the identified

11  officers and result in public approbrium and damage to their

12  reputations.

13       But by equating records classified by the agencies as

14  non-final and unsubstantiated with records that are false and

15  misleading, plaintiffs misstate the nature of the records at

16  issue here.

17       And as noted previously, plaintiffs are eliding the

18  distinction between the underlying allegation, which may be

19  about conduct that never happened, and the actual record being

20  released, which record states the outcome of an investigation

21  into that complaint.  Even if the charge is unsubstantiated or

22  non-final, any stigma or falsity is addressed by the record,

23  which makes clear that the charges -- for example,

24  unsubstantiated -- are non-final.

25       And the records therefore have information, such as

1      the agency's classification or disposition of the complaint or

2      charges, that contextualizes adequately any description of the

3      underlying complaint or charges.

4            Accurate descriptions of allegations and personnel

5      actions or decisions that are made public are not actionable,

6      "even when a reader might infer something unfavorable about the

7      employee from these allegations."  I'm quoting here from a

8      decision of Judge Seibel's of this district:  *Wiese vs. Kelly*,

9      reported at 2009 WL 2902513.  This is not a case, for example,

10     where the defendants are uncritically publishing the

11     allegations of misconduct made against officers as if these

12     allegations were true.  Disclosure of a record that an

13     allegation was found to be unfounded or unsubstantiated is a

14     true statement as to the outcome of an investigation of that

15     allegation.

16           Plaintiffs have made no showing that any record that

17     would be released by the City would inaccurately reflect the

18     disciplinary or investigative process.  Plaintiffs separately

19     argue that, in analyzing the stigma component, courts look to

20     the state substantive law of defamation.  And they claim that

21     the potential for members of the public to misunderstand the

22     record gives rise to stigma, because specifically "under New

23     York defamation law, when 'a reasonable listener could have

24     concluded that the statement was conveying a fact about the

25     plaintiff that was susceptible of a defamatory connotation,'

1       the statement is actionable."

2               I'm quoting here from the plaintiffs' brief at page

3       14.  They're in turn citing to a second department decision in

4       *Greenberg v. Spitzer*, reported at 155 A.D.3d 27.  But to

5       establish defamation under New York law, it is "well settled"

6       that the statement must actually be false.  And I am quoting

7       here from *Tannerite Sports, LLC v. NBC Universal News Grp.*, 864

8       F.3d 236, a Second Circuit decision from 2017.  And here, for

9       example, a CCRB record's statement that an allegation is

10      unsubstantiated is not a false statement; it is an accurate

11      depiction of an outcome of a CCRB investigation into a

12      complaint.

13              Truth does provide a defense to defamation claims, as

14      New York courts have long recognized.  Plaintiffs cite no case

15      to the contrary, nor have they offered any evidence to support

16      the assertion that the release of these records will lead to

17      widespread dissemination of false statements.

18              One article that was brought to my attention was the

19      Guardian article, "NYPD's 10 Most unWanted."  It was discussed

20      at the PI hearing on Tuesday.  It doesn't suggest otherwise.

21      It doesn't cause me to change my decision.  That article

22      reports information about the number of allegations that the

23      CCRB found to be substantiated and unsubstantiated for several

24      NYPD officers.  That some of the allegations cited in the

25      article were unsubstantiated.  It's not a false statement.  It

1   is a truthful statement about the CCRB's findings or resolution

2   of those allegations.  And the CCRB or other agency findings,

3   as to their investigations into allegations of misconduct, are

4   not in and of themselves false, nor have or can plaintiffs

5   allege as such.

6         These records are also not sufficiently derogatory to

7   injure plaintiffs' reputation.  As discussed previously in the

8   context of my discussion of irreparable harm, plaintiffs have

9   not established that the publication of these records will

10  cause any concrete, particularized, actual, or imminent injury

11  to their reputation.  And for these reasons previously

12  discussed, they have failed to establish that any of the

13  records are likely to cause actual injury to reputation.

14        There may be a subset of the records at issue that are

15  uncomplimentary in the abstract.  The plaintiffs do not specify

16  what records or what information in such records may fall into

17  this hypothetical subset.  Even so, abstract illusions to

18  unflattering records are not evidence that public access will

19  cause actual harm to any particular officer's reputation.  And

20  as defendants in amici have explained, the vast majority of

21  records to be released that plaintiffs seek to enjoin simply

22  report basic facts about a complaint or disciplinary action and

23  the outcome of that complaint or action.

24        Also, as discussed repeatedly in this opinion, records

25  disclosed by defendants will have information, dispositional

discussions, that will contextualize the description of the

complaint or charges provided, allowing members of the public,

and those making future hiring discussions, to evaluate the

complaint, the ensuing investigation, and its outcome

independently.

Now, plaintiffs have failed to establish that these

records are false and they have, therefore, failed to meet the

stigma prong.  But for the sake of completeness, I will note

here that plaintiffs have also failed to meet the plus prong of

the claim.  And the plus prong of the stigma-plus doctrine is

satisfied by the deprivation of a plaintiff's property or some

other tangible interest.  The *Sadallah* case, which I discussed

earlier, is indicative of that point.

Plaintiffs argue that the plus is satisfied here by

the potential loss of employment or future employment

opportunities caused by the release of these records.

Preliminarily, and as noted above, it appears that injunctive

relief may be improper to address this harm based on cases like

*Savage v. Gorski* that I mentioned.

But additionally, Second Circuit precedent forecloses

the argument that the plus prong is satisfied by a vague

allegation of potential loss of employment due to reputational

harm.  In *Valmonte v. Bane,* 18 F.3d 992, a Second Circuit

decision from 1994, the Second Circuit explained that "the

deleterious effects which flow directly from a sullied

```
 1    reputation," including "the impact the defamation might have on

 2    job prospects" are insufficient to establish a protected

 3    liberty interest.

 4          At base, vague allegations of future loss of

 5    employment are another way of claiming stigmatic harm.  And for

 6    this reason, the cases on which plaintiffs rely are inapposite,

 7    because they deal with concrete harms beyond vague suggestions

 8    that reputational harm may negatively impact future job

 9    prospects.  Even assuming that such loss of employment, or that

10    these allegations could satisfy the standard, plaintiffs'

11    alleged harm to employment prospects is so remote that it is

12    not proof of a tangible state-imposed burden concurrent with

13    the disclosure.  To meet their burden, plaintiffs must do more

14    than simply say that records may lead to diminished employment

15    prospects for some vague subset of officers in the future.

16    Again, plaintiffs failed to explain why law enforcement

17    officers in charge of hiring would be incapable of interpreting

18    the records disclosed by defendants.

19          As noted repeatedly, the dispositional discussions

20    will contextualize the description of the complaint or charges

21    provided.  They will allow future employers to make hiring

22    decisions by evaluating the complaint and the investigation and

23    its outcome independently.  And as to any claim that the

24    publication of these records may cause the immediate loss of

25    employment for some officers, plaintiffs do not explain why an
```

1    officer would lose their job.  As a result of the publication

2    of records that the employer already has access to, but even

3    assuming for the sake of argument that the release of these

4    records meet both the stigma and the plus prongs -- and they do

5    not -- plaintiffs fail to allege that the officers are deprived

6    of the process that is due, because in the creation of the

7    records themselves, the officers are entitled to

8    pre-deprivation disciplinary hearings, the opportunity to

9    respond to allegations throughout the course of the

10   investigation, and the availability of Article 78 review.  So

11   on these many bases, there is not an adequate showing as to the

12   due process claim.

13         Plaintiffs separately allege a violation of the equal

14   protection clauses of the New York and the U.S. constitutions,

15   claiming that defendants have singled out firefighters, police

16   and correction officers for disclosure of unfounded

17   disciplinary records, but have not done so for the myriad other

18   state license professionals.  I'm quoting here -- and

19   paraphrasing a bit -- from plaintiffs' brief at page 19:  In

20   this regard, New York state equal protection guarantees are

21   coextensive with the rights provided under the Federal Equal

22   Protection Clause.

23         And the plaintiffs concede that they are not members

24   of a protected class, such that the appropriate level of

25   scrutiny is a rational basis review.  And "as a general rule,

the equal protection guarantee of the constitution is satisfied
when the government differentiates between persons for a reason
that there's a rationals relationship to an appropriate
governmental interest."  I'm quoting here from *Able vs. United
States,* 155 F.3d, 628, a Second Circuit decision from 1998.

Plaintiffs' equal protection claims fail for three
independent reasons:  First, they are foreclosed by Supreme
Court precedent; second, plaintiffs fail to establish that they
are similarly situated to the City employees they cite as
comparators; and third, plaintiffs fail to establish the
defendants' actions are not rationally related to the
government's interest in transparency and accountability.

So to begin, plaintiffs' equal protection claims are
foreclosed by the Supreme Court's decision in *Engquist v. Ore.
Dep't of Agric.*, 553 U.S. 591 from 2008.  And *Engquist*
precludes equal protection claims challenging different
applications of discretion to different employees, because
permitting such claims would constitutionalize all discussions
by a public employer concerning its employees.  And that's
exactly what plaintiffs are trying to do here.

Second, "to satisfy the 'similarly situated' element
of an equal protection claim, the level of similarity between
plaintiffs and the persons with whom they compare themselves
must be extremely high."  I'm quoting here from *Neilson v.
D'Angelis,* 409 F.3d, 100, a Second Circuit decision from 2005

 1   that was overruled on other grounds in 2008.

 2           But plaintiffs work in law enforcement, and the very

 3   nature of their roles, vis-a-vis the public, is very different

 4   from other City employees.  They are not similarly situated.

 5   And I believe plaintiffs conceded as much at oral argument.

 6   Officers patrol the streets with firearms and are authorized to

 7   use force under the aegis of state power.  And therefore, a

 8   state-licensed medical physicist is just not similarly situated

 9   to a City-employed police officer or correction officer.

10           Third, and related to the previous point, the City has

11   articulated a rational and nondiscriminatory basis for treating

12   the plaintiffs differently than other City employees, if it

13   could be found that these employees were similarly situated.

14   As the city and the state legislature articulated, there are

15   strong governmental interests in accountability and

16   transparency.  And the role of police officers in society, the

17   unique responsibilities they carry, the harms they are capable

18   of inflicting on the public, also explain why the City might

19   choose to release records about investigations into allegations

20   of misconduct, but might not proactively release similar

21   records by other city employees, such as teachers or sanitation

22   workers, who do not have similar powers.

23           Plaintiffs' only explanation for why this is

24   irrational rest on an opinion of a Committee on Open

25   Government.  And this opinion opined that, even after repeal of

1    Section 50-a, requests for disciplinary records of law

2    enforcement must be reviewed in the same manner as a request

3    for disciplinary records of any other public employee.  This

4    instruction, this advisory opinion, is not -- or does not

5    establish a constitutional violation.

6         And this final claim under Article 78 takes a

7    different species -- or there are different varieties of it.

8    The first argument of it is that the repeal of Section 50-a was

9    in and of itself arbitrary and capricious.  And I feel that

10   claim was throughly rebutted by the Amicus briefs filed in this

11   case, in which defendants and the amici explained that the

12   legislature thoroughly considered and rejected plaintiffs'

13   arguments for exempting unsubstantiated, unfounded, and

14   exonerated allegations from disclosure.  And as evidence that

15   the legislature considered plaintiffs' concerns about privacy

16   and safety, they made a reasoned determination to enact the

17   provisions additional to the New York Public Officers' Law,

18   which requires the redaction of certain information in law

19   enforcement disciplinary histories, including a medical

20   history, home address, personal telephone number, personal

21   email address, and mental health service, and that that was the

22   correct balance to strike.  The legislature also added a

23   provision permitting agencies to redact records pertaining to

24   technical infractions.  And so I'm entirely unpersuaded that

25   the repeal itself was arbitrary or capricious.

1          The second version of the argument that I was able to

2     discern from the briefing was that the error of law, it was

3     arbitrary and capricious for defendants to interpret the repeal

4     of Section 50-a in the way that they have and to change decades

5     of agency practice on the protections afforded by them by 50-a

6     in addressing, on a going forward basis, requests for

7     information under FOIL.

8          But "in reviewing an administrative agency

9     determination, courts must ascertain whether there is a

10    rational basis for the action in question or whether it is

11    arbitrary and capricious.  I'm citing here and quoting from

12    *Matter of Gilman v. New York State Division of Housing and*

13    *Community Renewal,* 99 N.Y.2d 144 from the Court of Appeals from

14    2002.

15         On this record, I will not find that the NYPD's and

16    the CCRB's planned disclosures, in light of the repeal of 50-a,

17    are arbitrary and capricious.  Rather, it appears that the

18    planned disclosures accord with the legislative purposes of

19    both the repeal of 50-a, the concurrent amendments to Public

20    Officers' Law, Section 89, and FOIL.

21         And at oral argument, corporation counsel repeatedly

22    assured the Court that the agencies have merely removed Section

23    50-a from their list of exemptions or considerations in

24    responding to FOIL requests.  They do, however, continue to do

25    a review of the records in response to FOIL requests to

1    determine whether any of the other FOIL exemptions apply.   In

2    many cases that is done on an individualized basis; and with

3    respect to certain officer reports, the protections are done at

4    the outset with respect to the group of records that is

5    produced.

6            But to the extent that other FOIL exemptions remain to

7    protect officers' privacy and safety rights, those rights still

8    exist.   And so plaintiffs' final argument on this point is that

9    the NYPD has not gone through the formal rule-making process

10   pursuant to the City Administrative Procedures Act.   And they

11   cite a rule of the City of New York that provides for public

12   access to NYPD disciplinary hearings.   But the repeal of

13   section 50-a simply makes the public's right broader than what

14   the City of New York rule already provides.   It is not

15   inconsistent with the rule.   And I, therefore, reject

16   plaintiffs' citation to *Lynch v. New York City Civilian*

17   *Complaint Review Bd.*, 125 N.Y.S.3d 395 from the this year.

18   Because in that case, CCRB had amended its rules and resolution

19   to begin investigating sexual misconduct which had previously

20   been referred to the NYPD internal affairs bureau.   Here, the

21   CCRB and the NYPD have not amended their rules.   They are

22   merely reacting to a change in the law which they themselves

23   did not occasion, and plaintiffs cannot show otherwise.

24           I'm now going to turn to balance of hardships and the

25   balance of the equities.   And I'll ask the parties for this

1    last section of the opinion to continue to have your phones on

2    mute.

3            The Second Circuit's decision in the *Trump vs.*

4    *Deutsche Bank* case that I mentioned earlier contained an

5    extensive discussion of that Court's and the Supreme Court's

6    that evolving standards for preliminary injunction motions.

7    And that discussion included analysis of the standard

8    articulated in *Winter vs. Natural Resources Defense Counsel*

9    *Incorporated,* 555 U.S. 7 from 2008.  And in that particular

10   setting, there was also a requirement, in addition to the

11   showing of a likelihood of success on the merits and the

12   showing of irreparable harm, that the balance of equity tips in

13   the movant's favor and that an injunction is in the public

14   interest.

15           And ultimately, the *Trump* court erred in favor of

16   inclusion.  They proceeded to consider not only whether

17   appellants had met the governing likelihood of success

18   standard, but also whether they had satisfied the other

19   requirements in one or more of these three standards:

20   Sufficiently serious questions going to the merits of their

21   claims to make them fair ground for litigation; a balance of

22   hardships tipping decidedly in their favor;  and the public

23   interest favoring an injunction.  And as I've mentioned

24   earlier, in the most recent decision authored by Judge Lynch,

25   there was a suggestion that the latter two would merge

1    together.

2         But beginning with the issue of the balance of

3    hardships, the Court finds that they do not tip decidedly in

4    plaintiffs' favor.  Plaintiffs have claimed a variety of harms,

5    contractual and constitutional.  But for the reasons that I've

6    just described, most of these claims fail even for want of

7    actual substantiation or because the law is not what plaintiffs

8    wish it to be.  But conversely, were I to enjoin release of

9    these materials, defendants would suffer, as they would be

10   stymied and improperly so, in their efforts to comply with

11   recent legislative developments.  More broadly, I find that

12   injunction disserves the public interests.

13        After years of discussion and debate, New York's

14   legislature determined to repeal Section 50-a, and thereby

15   bring themselves in line with most of the other states in their

16   treatment of disciplinary records.  And in this regard, I'm

17   remembering one of the amici noted that -- I believe it was --

18   New York and Delaware were deemed to be outliers in this

19   regard.

20        But turning to the public interest, the decision to

21   amend Section 50-a was not made haphazardly.  It was designed

22   to promote transparency and accountability, to improve

23   relations between New York's law enforcement communities and

24   their first-responders and the actual communities of people

25   that they serve, to aid law makers in arriving at policy-making

1    decisions, to aid underserved elements of New York's population
2    and ultimately, to better protect the officers themselves.  The
3    decision to amend was also made with due regard for the safety
4    and privacy interests of the affected officers.  Amendments
5    were made to the Public Officers' Law that mandated the
6    redaction of certain categories of information that permitted
7    the withholding of other categories of information.  And I
8    reject the foundational argument that no one -- law enforcement
9    or civilian -- can appreciate the distinctions between
10   substantiated, unsubstantiated, exonerated, unfounded and
11   non-final claims.
12          I also find, contrary to plaintiffs' arguments, that
13   the agencies in question, the defendant agencies in this case,
14   have neither forgotten nor disregarded FOIL and its exemptions.
15   To grant the injunctive relief sought on this record would
16   subvert the intent of both the legislature and the electorate
17   it serves.  And with the limited exception described above
18   regarding to Schedule A command discipline violations that have
19   been resolved in a particular way, I am denying plaintiffs'
20   motion for injunctive relief.
21          As with the modification of my injunctive motion a
22   couple of weeks ago, I'm staying this decision until Monday at
23   2:00 p.m. so the plaintiffs can, if they wish to do so, appeal
24   to the Second Circuit.  That is my decision.
25          I believe -- and I don't mean to put her on the spot,

```
 1    but I believe that Ms. Barker remains on the line.

 2              Is that correct.

 3              MS. BARKER:  Yes, your Honor.

 4              THE COURT:  Ms. Barker, you had asked me -- and I

 5    promised to talk to you -- about a schedule for the motion to

 6    dismiss.

 7              Given the amount of time that I have kept everyone on

 8    this call, may I ask you to confer with the plaintiffs and to

 9    propose for me a schedule for that motion?

10              MS. BARKER:  Yes, your Honor.  No problem.

11              THE COURT:  Okay.  Thank you.

12              That is all I have to discuss.  I believe I've

13    addressed everything with the parties.  And with that, I am

14    going to adjourn this proceeding.

15              I'm going to thank you for your patience.  I'm going

16    to thank the vast majority of you that knew how to use your

17    mute buttons, and I'll smile at those of who you who did not.

18    And I wish you all a safe weekend.

19              Thank you.  We are adjourned.

20                              * * * * * *

21

22

23

24

25
```